MATTIE SHELBY, and MATTIE SHELBY, Executrix of the Estate of D. V. HENSON, Deceased, Respond-ents, v. CONNECTICUT FIRE INSURANCE COM-PANY OF HARTFORD, Appellant.*

Kansas City Court of Appeals. May 26, 1924.

1. **INSURANCE:** Oral Contract: Evidence Held to Warrant Finding That a Complete Oral Contract of Insurance was Entered into Prior to Destruction of Property of Insured. In an action upon an al-leged oral contract of insurance, evidence *held* to warrant finding that prior to destruction of property of insured a complete oral contract of insurance was entered into with agent of insurance company.

2. ———: Purpose of Statute Held Not to Affect Power of Non-resident Agent to Bind His Company. Section 6315, Revised Statutes 1919, does not affect power of a non-resident insurance agent to bind his company, the purpose of statute being to enforce payment of license fees.

3. ———: Actual Authority of Agent to Make Insurance Contract Im-material Where he Had Apparent Authority so to do. The actual authority of a non-resident insurance agent to make an insurance contract in Missouri is immaterial in determining liability of insurance where agent had apparent authority to make the con-tract.

4. **TRIAL PRACTICE:** Demurrer: Upon Overruling of General De-murrer and Request for Instruction on Question of Agency Which Was Given Defendant, Held Precluded from Attacking Judgment on Ground There Was no Evidence to Support Finding of Agency. Where defendant's demurrer to the evidence was general, and after

it was overruled defendant requested and obtained instructions on the question of whether alleged agent was such in fact thereby conceding that there was sufficient evidence to raise an issue in that regard, defendant was precluded from attacking the judgment on the ground that there was no evidence to support a finding of agency.

5. **INSTRUCTION: Instruction Ignoring Issue upon Which Case Was Submitted Held Properly Refused.** In an action upon a fire policy, where plaintiff's case was submitted upon the apparent authority of insured's agent, a requested instruction by insured which entirely ignored question of agent's apparent authority was properly refused.

6. **INSURANCE: Oral Contract of Insurance Held Not of Temporary Validity.** An oral contract of insurance *held* not of temporary validity though it contemplated that a written policy would be issued, as the insurance was to be effective *instanter*, and there was nothing said about the oral insurance being effective only until a policy could be written.

7. **INSTRUCTION: Demurrer: Insurer Held Precluded from Claiming That Oral Contract of Insurance Was Binding Only Temporarily.** Where no point was made in court below that an oral contract of insurance was binding only temporarily, and; after having offered only a general demurrer, defendant submitted instructions which necessarily or impliedly conceded that if contract was made it would be binding, defendant *held* precluded from claiming that the oral contract could not exist and remain binding until the time of the fire which destroyed the property insured.

8. **INSURANCE: If Oral Insurance Contract Was Binding Only Until Reduced to Writing, Insurer Remained Liable Where Such Failure so to do Was Fault of Its Agent and Not Insured.** If an oral contract of insurance was to be regarded as temporary only, insurer not permitted to escape liability on ground contract was not sooner reduced to writing where such failure so to do was wholly the fault of agent of insurer and not that of insured.

*Headnotes 1. Fire Insurance, 26 C. J., Section 754; 2. Insurance, 32 C. J., Section 37; 3. Insurance, 32 C. J., Section 181; 4. Trial, 38 Cyc., p. 1550; 5. Trial, 38 Cyc., p. 1632; 6. Insurance, 32 C. J., Section 185; 7. Appeal and Error, 4 C. J., Section 2622; 8. Insurance, 32 C. J., Section 185.

Appeal from the Circuit Court of Lafayette County.—
*Hon. Robert M. Reynolds,* Judge.

AFFIRMED.

*Lamm & Lamm* and *Forace F. Blackwell* for appellant.

*Hackney & Welch* for respondents.

TRIMBLE, P. J.—The cause of action herein is upon an alleged oral contract of insurance for $3000 covering household goods and effects of Mattie Shelby and her father, D. V. Henson, located in an apartment house at 3120 Charlotte Street, Kansas City, Missouri. The contract is claimed to have been entered into between November 1st (or a date near that) and December 26, 1919, by Mattie Shelby (acting for herself and her father), and Pollman, defendant's agent at LaCygne, Kansas.

A verdict was returned in plaintiffs' favor and, upon judgment being rendered thereon, defendant appealed.

The property was destroyed by fire on February 29, 1920. Ten days before that, the father died testate and Mrs. Shelby, his only heir, was appointed his executrix. No contention is raised over the fact of the fire, the ownership of the property or the amount of loss sustained. Nor is there any question over the sufficiency of proofs, as the Company denied liability. The defense is there was no contract of insurance; and that, even if Mrs. Shelby and the agent, Pollman, had the agreement claimed, it was void and of no effect under the law; and furthermore that it could not bind the company because of Pollman's lack of authority.

There is no question but that from February —, 1894, down to the date of the fire, Pollman, residing at LaCygne, Kansas was defendant's agent "to counter-

sign, issue, renew and consent to the transfer of policies of insurance.'' But defendant's contention is that such agency was only in LaCygne and vicinity, and that Pollman's authority did not extend to the making of contracts of insurance *in Missouri,* and that, in view of section 6315, Revised Statutes 1919, contracts of insurance can be made in this State only by resident Missouri agents.

Pollman was president of a bank in LaCygne, which is a town some forty-five or fifty miles south of Kansas City and located in Kansas a short distance west of the Missouri line. He was generally known in that community to be defendant's agent and had the defendant's agency sign up in his office. For two years or more prior to November, 1919, Mrs. Shelby lived with her father on a farm a few miles out from LaCygne; and she, at that time, had known Pollman for two or three years. She and her father knew he was defendant's agent with power to countersign and issue policies and he had, on former occasions, written policies of insurance for her.

While on said farm, D. V. Henson, the father, had, on March 9, 1918, obtained from defendant, through another agent, Gruver, operating in that territory, an insurance policy in the sum of $2175 covering household furniture, grain and stock. This policy was for a term of three years, running from March 9, 1918, to March 9, 1921.

At some unshown date thereafter, Mrs. Shelby, desiring to insure her automobile, paid said agent Gruver the premium therefor, but was unable thereafter to get a policy from him or to secure the return of her money. After consulting Pollman, defendant's recognized agent, she, at his suggestion, wrote defendant about it, and in this letter she told defendant she still wanted to do business with the company but not through its agent Gruver. In reply defendant wrote her, acknowledging receipt of that or some other premium money, and said, among other things, ''When in need of *additional* insurance or you desire any *change in your policy,* communicate with

the agent of the 'Old Connecticut' for prompt and satisfactory service'' etc. Mrs. Shelby understood this to mean that thereafter she should not bother the home office with such matters but should take them up through their agent Pollman.

Shortly before November 1, 1919, Mrs. Shelby went to Pollman in the bank at LaCygne and told him they were selling out and were going to move to Kansas City, where they were intending to buy a rooming house or hotel, in order that she might have a way to provide for her father as his health was failing. She wanted to know of him what to do about the insurance. The premium was fully paid on the existing policy and he told her she could have it transferred to Kansas City. She told him the policy was also on grain and livestock but he told her, ''That doesn't matter, you can have that transferred to household effects.'' As she told him she was expecting to buy a hotel or rooming house, he told her, ''Well, you will want more insurance,'' and she replied that they wanted to increase the insurance as they expected to buy a large place. He and she then tentatively agreed on $3000 as the amount they likely would want. He told her to wait, however, until she got up to Kansas City and knew what her location would be and the amount of furniture she would add to what they already had and how much additional insurance she would want, and he would then have the insurance raised. He asked her if she was going to be on the Kansas side or Missouri side and she told him they would be on the Missouri side. She asked him if he could transfer the insurance to Kansas City and he replied, ''Why sure.''

It is apparent from Mrs. Shelby's testimony that she did not know whether Pollman would write the new insurance and cancel the old policy or merely transfer the old policy with the additional insurance added thereon. She thought he would issue the policy and would send in the old policy so that the unexpired premium on it could be treated as cash and applied on the premium on the new policy. Pollman, she says, did not tell

her he would have to send the old policy in to headquar.-ters in order to have the insurance issued.

It was agreed in this conversation that the insurance on the Kansas City property should exist for the same length of time that the old policy had to run. Pollman told her that after cancelling the insurance, under the old policy, on the stock and grain, there wouldn't be enough unearned premium to provide for insurance on the Kansas City property; but, as she had something over $1500 on deposit in the bank, it was agreed that he should check out of said account the amount necessary to pay for whatever additional premium was needed. Pollman instructed her to write him when she got located so he would know what address to write the insurance for; and it was fully understood and agreed between both of them that the property to be insured was hers and her father's and that the insurance was for both of them.

Mrs. Shelby agreed to get the old policy and bring it in, but owing to muddy roads she was not able to do so, and on the day before she and her father moved to Kansas City, she called Pollman over the telephone and he told her to "mail me the policy after you get to Kansas City and it will be all right." He asked her if she had decided or how much insurance she wanted and she told him $3000.

After Mrs. Shelby and her father came to Kansas City, they acquired a lease (which they had verbally contracted for before coming to Kansas City), on property at 3120 Charlotte street, and additional furniture was obtained with which to furnish it.

On December 4th or 5th, 1919, Mrs. Shelby telephoned Pollman that they had acquired the lease and were moving into the property at 3120 Charlotte street, and requested him to make the policy for $3000 on household goods and effects. Pollman agreed to do so and said, "That is all right; your insurance will take effect at this hour." Mrs. Shelby, pursuant to the arrangement whereby she was to send him the old policy, sent it by

registered mail, accompanied with a letter which will be hereinafter referred to.

It seems that about December 26, 1919, Mrs. Shelby, having-read in the papers of some trouble Pollman was in, went to Lacygne and had a conversation with him in the bank, in the presence of the cashier, Kennedy, and another person by the name of Watts.

Mrs. Shelby says that in that conversation Pollman told her she was insured and not to let it worry her; that the policy was either on the road to her or was in the bank somewhere; that he had been busy and had not slept any for several weeks, he having been charged with forgery, and he hadn't carefully looked after his own affairs, but would look for the policy just as soon as he could; he was sure the policy was in the bank; and he again assured her he had taken care of it for her and not to let it worry her any more. Thinking he had mislaid it in the bank, and not knowing that he had not issued the policy, she was lulled into a feeling of security.

On February 19, 1920, her father died and on the night of the 29th of that month, the fire occurred. The next morning, Mrs. Shelby telephoned Pollman, notifying him of the fire and asking him to mail the policy to her. He said, "I thought you had gotten that quite awhile ago," and told her that he was then out at his farm, but would go into town immediately and get the policy at the bank and mail it to her and that she should "take steps to protect" her property at once.

He did not send the policy, however, and, being unable to obtain it or secure any further answer from Pollman, Mrs. Shelby, on April 3, 1920, went to LaCygne, in company with an insurance adjuster whom she had employed to assist her, and there learned for the first time that Pollman did not have a written policy and had not issued any. While she was in the bank and search was being made for the policy Pollman was supposed to have issued, the Cashier brought to Pollman an unopened letter from defendant, addressed to him. Pollman

opened the letter in the presence of Mrs. Shelby and her insurance adjuster, and it was found to be a letter from defendant, dated January 9, 1920, saying that the old policy (which, as heretofore stated, had been issued by Gruver) had been cancelled and the unearned premium sent by mail to the agent Gruver. Pollman had been out of, or at least away from, the bank for about three weeks prior to Mrs. Shelby's visit, on account of the criminal charge and the action based thereon, which was then pending against him.

Mrs. Shelby was never told that Pollman's authority to contract for insurance was limited or restricted in any way, or that he was without authority to contract for insurance on property in Kansas City. In fact, the old policy contained a clause furnishing, among other things, the following insurance: $800 on horses, mules and colts *anywhere,* $450 on cattle *anywhere,* $100 on hogs *anywhere,"* though perhaps little weight should be given to this, as a careful reading of other portions of the policy would likely have disclosed, at least to a person capable of interpreting such contracts, that this applied to the stock while on or temporarily off the farm, except while in transit or in public stockyards.

Nor did Mrs. Shelby ever have any notice, prior to the fire, that Pollman was no longer defendant's agent; in fact, it is not clear from the record when, if ever, he ceased to be such agent unless he ceased to be such on and after February 29, 1920, which was the date of the fire. He was succeeded as agent by a Mr. Bishop, who seems to have been in or who went into the bank; and there is evidence from which it might be inferred that the defendant's letter of January 9, 1921, heretofore referred to, and which had remained unopened in the bank, was in Bishop's possession. The evidence is clear that no communication of its contents, or of the facts it purported to state, was made to Mrs. Shelby. Moreover, neither she nor her father ever received or had any notice of the check for the unearned premium on the old policy, and if

defendant send said unearned premium to its agent Gruver, he never turned it over to them or either of them.

It was admitted that the usual and customary rate charged by defendant on the risk and property involved herein, in Kansas City, Missouri, was sixty cents per hundred dollars of insurance, which would make the premium for the $3000 insurance amount to $18.

Mrs. Shelby not only clearly and positively testified to the matters hereinabove set forth, but her testimony as to what Pollman said to her in the bank in the presence of Watts is corroborated by Watts; and her evidence is further borne out by certain features of Pollman's testimony. Watts testified that he was in the bank at the time Mrs. Shelby was there about Christmas asking for her policy; and he says Pollman told her that her insurance was good, he had already attended to it and that she needn't worry about it at all.

At the time of the trial, Pollman was confined in the Kansas penitentiary, having been convicted on the charge of forgery which had been made and was causing him so much worry and loss, of sleep, stated by him to Mrs. Shelby as the reason for his not being able to put his hand on her policy. Defendant, however, took his deposition. And in it he denied making any contract for insurance as claimed by Mrs. Shelby. But he admitted that Mrs. Shelby had consulted him about the premium she had paid Gruver and that he advised her what to do. He further admitted that she talked to him about moving to Kansas City and that in that conversation he said to her that he "would look after her insurance for her;" but testified that he didn't say he would write the policy, and although he says he knew he didn't have any authority to write policies outside of Linn County, yet he admitted he did write policies in Miami County, and also stated very positively that he did not say anything to her about any limitation on his authority. He admitted that she "must have" telephoned him on March 1, 1920, notifying him of the fire; that he had a conversation with

her on that occasion, but what that conversation was he could not remember, it was all a blank. He would not deny that he told her, when she asked for her policy on that occasion, she could rest assured she was fully pro· tected. He admitted that Mrs. Shelby was in the bank on December 26, 1919, and that Watts was present, but he could not recollect what conversation he had with her.

Mrs. Shelby, as shown hereinabove, testified that in her letter of December 4 or 5, 1919, she sent the old policy to Pollman. Pollman, in his deposition, admitted receiving this letter and that in it she "asked that her policy be transferred; in her letter she asked that the policy be transferred covering her property in Kansas City, Missouri." Although Pollman admits receiving this letter, it was not introduced in evidence nor was any explanation offered to account for its absence. Pollman admitted that, in this letter, Mrs. Shelby gave "her location and ———— that is, her location and where she was living; her address and location." He was asked: "You did intend to look after this matter of insurance for Mrs. Shelby and see that her property and her father's property, D. V. Henson's, was insured?" His answer was: "Well, now, the only thing I can say to you . . . is that I told her I would look after her, if she would send in the (old) policy I would look after it for her. Now what that would be I don't know."

Manifestly, therefore, the record discloses ample testimony (and that too of a clear, cogent and unequivocal character), to support the contention that in the conversation had between Mrs. Shelby and Pollman about November 1st, a contract of insurance was tentatively arranged for but which did not become a present existing contract of insurance until December 4 or 5, 1919, when it was effectuated in their conversation over the telephone ending with Pollman telling her that the insurance was in effect "at this hour." All of their previous conversation and arrangements culminated in the agreement made over the telephone at this time, and

it contained all the elements of a complete oral contract of insurance. The subject-matter was in existence and at the place where it was to be insured. The risk insured against was specified, the precise amount of indemnity fixed, the duration of the risk named, and the premium was susceptible of definite ascertainment and existed as a valid charge against Mrs. Shelby. Nothing was left open for future adjustment and the minds of the parties had fully met. [Worth v. German Ins. Co., 64 Mo. App. 583, 587; King v. Phoenix Ins. Co., 195 Mo. 290; Baile v. St. Joseph, etc., Ins. Co., 73 Mo. 371.]

But was it a contract which could bind defendant? It is contended that in view of section 6315, Revised Statutes 1919, it is not, and that defendant's general demurrer to the evidence should have been sustained. But the purpose of this statute is not to affect the power of the agent to bind his company, but to enforce the payment of license fees, and while it does provide a penalty against the company for its violation, it nowhere says that a contract entered into through nonresident or unlicensed agents shall be void or unenforceable. The principle involved is analogous to that announced in Lumberman's etc., Ins. Co. v. Kansas City, etc., R. Co., 149 Mo. 165, 178, where, in ruling on the contention that there was no liability because of the violation of a statute (now section 6321, Revised Statutes 1919), the Supreme Court said: "The statute nowhere declares contracts of insurance entered into in this State by companies organized under the laws thereof or of another State, who have not complied with its requirements, void, and it has been held in many cases that, although such contracts may be forbidden under penalty, unless the statute does so declare, the contracts are not void, but will be enforced against the company." [See, also, King v. Phoenix Ins. Co., 195 Mo. 290, 303; Commercial, etc., Ins. Co. v. Union, etc., Ins. Co., 19 How. (U. S.) 318, 321; Massachusetts Bonding & Ins. Co. v. Vance, 180 Pac. 693; Eikelberger v. Insurance Co. of North America, 197 Kan. 9.] The

case of Baldwin v. Conn. Mut. Life Ins. Co., 182 Mass. 389, cited in defendant's brief is not in point here, for that involved such an *unusual* contract as to give notice to the insured of the agent's lack of authority, and in that case there was no evidence of holding the agent out as having authority. Besides, if it were in point, it would violate our section 9753, Revised Statutes 1919, making parol and implied contracts binding on corporations, and would be contrary to the above-cited Missouri authorities.

Perhaps, as between Pollman and defendant, the former had no *actual* authority to make the contract, but the right to recover in this case is not dependent upon his *actual* but upon his *apparent* authority. It cannot be said that merely because Pollman lived at LaCygne, Kansas, and the insurance contracted for was in Missouri, therefore no apparent authority, so far as Mrs. Shelby is concerned, existed. In the absence of notice or knowledge to the contrary, she knew nothing of any limitations on his power and to her he had apparent authority. [Insurance Co. v. Wilkinson, 13 Wall, 222, 234-5.] In 2 Wood on Fire Ins. (2 Ed.), 1175-6, it is said that "where an agent is authorized to take risks in one place, it is presumed that he had authority to take them anywhere, and a risk taken by him outside his real jurisdiction, will be binding upon the company." [See, also, 1 May on Ins., sec. 130, p. 240.] And she could rely on his apparent authority. Hahn v. Guardian Assurance Co., 32 Pac. 683, 684, in which case an agent in Multnomah County, Oregon, and without authority outside thereof, insured property in the State of Washington. [See, also, Aetna Ins. Co. v. Maguire, 51 Ill. 342, 350; Lightbody v. North American Ins. Co., 23 Wend. (N. Y.) 18, 22; Kor v. American, etc., Ins. Co., 178 N. W. 182, 185.] In 22 Cyc. 1431, it is said:

"As to the authority of an agent acting within the general limits of his agency it is immaterial that he is described as a local agent and his authority is limited to particular territory. While the authority of an agent

may be limited to specified territory it is a question of fact whether his action in accepting risks was within the scope of his territory as reasonably understood by the insured.''

It cannot be said that Pollman was the agent of both parties and not of the defendant alone. [Section 6321, R. S. 1919.] He was clearly defendant's agent within the definition of that statute. Besides, it is not seen how defendant is now in any position to rightfully attack the judgment on the ground that there was no evidence to support this particular feature. The defendant's demurrer to the evidence was *general*. It was not directed to this or to any other particular feature. After it was overruled, defendant requested and obtained instructions on the question of whether he was plaintiffs' agent, thereby conceding that there was sufficient evidence to raise an issue in that regard. [Davison v. Hines, 246 S. W. 295, 302; Baker, etc., Lumber Co. v. Leach, 255 S. W. 955; Torrance v. Pryor, 210 S. W. 430; Crum v. Crum, 132 S. W. 1070, 1073.] It would seem that the same would likewise apply to any other special features on account of which it is claimed there was no evidence of a valid contract. With only a general demurrer asked and refused, defendant then obtained seven instructions in which it requested a jury finding upon whether there was a contract, whether Pollman was held out as having apparent authority to contract and whether he acted as defendant's agent.

From what has been said heretofore, it follows that there was no error in refusing defendant's instruction No. 9; and besides, it ignored entirely the question of Pollman's apparent authority. Plaintiffs' case was submitted on this and not upon his actual authority.

It is contended that plaintiffs' instruction No. 1 is erroneous for the alleged reason that an oral contract of insurance, even if made, has nothing more than a *temporary* validity. The contract, however, was one of present insurance dating from the very hour of the conversation. While it contemplated that a written policy

would be issued, yet the insurance was to be effective *instanter*, and there was nothing said about the oral insurance being effective only until a policy could be written. Of course, the parties contemplated that a written policy, evidencing the contract, would be drawn up, but, when drawn, the insurance specified by it would date from the date of the oral contract. Their agreement was not one merely that a written policy or contract of insurance would be entered into, but that the insurance was already effected. Mrs. Shelby was later led to believe that a policy had been written, and it should not be now contended that the oral contract was only for a limited period and that she should be denied relief because a policy was not written between the time of the oral contract and · the fire, a period of nearly three months.

Moreover, as indicated before, no point was made in the court below that the contract could be binding only temporarily; and, after having offered only a general demurrer, defendant submitted instructions which necessarily, or impliedly at least, conceded that if the contract was made, and the other submitted issues existed, it would be binding. Hence defendant is not now in a position to claim that the oral contract could not exist and remain binding until the time of the fire. There is no statute in this State which says an oral contract of insurance is to be temporary only; and if such a contract is, in the nature of things, to be regarded as temporary, nevertheless, under the circumstances of this case, defendant ought not to be permitted to escape liability on the ground that the contract was not sooner reduced to writing, for that was wholly the fault of Pollman, its agent, and not of Mrs. Shelby.

Objection is made to plaintiffs' instruction No. 2 but the error is not specified, and nothing appears to be wrong with it. Certainly, there is not if we are correct in what has been already said.

We entertain the view that the judgment should be affirmed and it is accordingly so ordered. All concur.