**INLAND USA, INC.,**
Plaintiff/Respondent/Cross-Appellant,

v.

**REED STENHOUSE, INC. OF MISSOURI, Defendant/Appellant/Cross-Respondent,**

and

**The Home Insurance Company,**
Defendant/Respondent.

No. 46279.

Missouri Court of Appeals,
Eastern District.

Sept. 27, 1983.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 15, 1983.

Michael A. Fisher, Robert D. Litz, St. Louis, for Reed Stenhouse, Inc.

Barry A. Short, Michael A. Vitale, Lewis, Rice, Tucker, Allen & Chubb, St. Louis, for Inland USA.

David S. Slavkin, Bryan, Cave, McPheeters & McRoberts, St. Louis, for Home Ins.

Before GAERTNER, P.J., and KENNEDY and ADOLF, Special Judges.

DON W. KENNEDY, Special Judge.

*History of case.*

Inland Oil and Transport Company [1] filed this action against Insurance Consultants, Inc., an insurance brokerage firm, for damages for ICI's alleged fraud in misrepresenting to Inland that it had secured marine insurance coverage for Inland from the Home Insurance Company for the year beginning June 1, 1975. Upon jury trial, the

---

1. The name of Inland Oil and Transport Company has been changed to Inland USA, and Insurance Consultants, Inc., has changed to Reed, Shaw, Stenhouse, Inc., or Reed Stenhouse, Inc. Throughout the opinion we use the names of the respective entities as they were during the events mentioned in the opinion.

jury returned a verdict for Inland for $35,-000 actual damages and $10,000 punitive damages. ICI appeals from the judgment rendered thereon.

In another count of the petition, Inland claimed damages for ICI's alleged fraud in misrepresenting to Inland that it had secured marine insurance for it from Old Republic Insurance Company for the period of June 5-September 17, 1975. On this count, the jury returned a verdict in favor of ICI and Inland has appealed from the ensuing judgment.

In yet another count of the petition, Inland sued the Home Insurance Company for damages for breach of contract for failure to furnish insurance under a binder issued by ICI. The trial court at the close of plaintiff's evidence sustained Home's motion for a directed verdict. Inland has appealed from that judgment.

ICI counterclaimed against Inland for $80,517.84 insurance premiums which it claimed it had paid in Inland's behalf and which Inland had refused to pay. The jury found for Inland on this count, and the ensuing judgment has not been appealed.

Mutual cross-claims of ICI and Home Insurance for indemnity against any judgment secured by Inland have been severed for separate trial and the proceedings stayed pending the disposition of this appeal.

*Facts.*

The background facts are as follows:

Inland owned and operated a fleet of towboats and barges. Its marine insurance coverage was to expire on June 1, 1975 and it was seeking coverage for the year commencing that day. The search was in the hands of Herbert Wolkowitz, president of Inland. He was in contact with several insurance brokers including ICI. ICI had secured the marine insurance coverage which was then in effect and which was about to expire. The carrier which had the insurance risk did not wish to continue carrying the same.

The account representative at ICI who dealt with Wolkowitz was one Bob Scissors.

Scissors was working energetically to locate insurance coverage for Inland. One quotation he had submitted to Inland, for Canadian Marine, proved to be too high for Wolkowitz. Scissors then had orally told Wolkowitz that he could supply coverage from Lloyd's of London for an annual premium of $260,000. Wolkowitz on May 30 called Scissors and told him that Inland would take the Lloyd's proposal. Scissors, so Wolkowitz testified, was "overjoyed".

The evidence does not show exactly what happened (Scissors did not testify), but whatever insurance coverage he planned to furnish Inland failed to materialize, and he was left on May 30 with the imminent prospect of the loss of Inland's marine insurance business for the ensuing year. Wolkowitz was not informed of this difficulty, and assumed that he had purchased insurance for the year, and he was expecting Scissors later in the day to deliver a binder.

In this distressing situation, Scissors had a conference with his superiors at ICI. One of them was Mike Habel, commercial marketing manager. Another was Timothy King, executive vice-president and general manager. Scissors explained his predicament. He told Habel and King that Wolkowitz had on his desk a quote from Home Insurance which had been given by another insurance brokerage, Associated Underwriters. This quote, Scissors told Habel and King, was acceptable to Wolkowitz. Wolkowitz had given Associated Underwriters an "agent of record" letter to Home Insurance. The purpose of an "agent of record" letter was to designate a particular agent to secure a premium quotation from a particular insurer for the required coverage. Wolkowitz would as a matter of practice give only one agent of record letter for a single insurance company. Having given one to Associated Underwriters for Home Insurance, he would not give a similar letter to ICI. Correspondingly, Home Insurance would not give a premium quote to ICI for the Inland business because ICI had no agent of record letter from Inland. Home Insurance as a general thing would not give

a quote to a second insurance broker for the same business, after having given a quote to one "agent of record". A "quote", as we interpret the testimony, constituted a proposal to furnish insurance at a particular premium.

As a result of the conference at ICI among Scissors, Habel and King, Habel called the Home Insurance office in St. Louis and talked with Ken Hull, its marine underwriter, and Dick Bergin, who was the underwriting manager. While the exact understanding of this conversation is somewhat in doubt, it could be believed that Bergin told Habel that if ICI secured an agent of record letter from Inland, it would "release" its quote to ICI for submission to Inland. The trick then was to get Wolkowitz to sign an agent of record letter authorizing ICI to obtain a quotation from Home on the Inland coverage. This would be in violation of Wolkowitz's policy not to give a second agent of record letter to a different broker for the same insurance company. Habel, however, prepared a draft of a letter running to Home Insurance from Inland, designating ICI his agent of record. Scissors carried the draft to Wolkowitz's office on the afternoon of Friday, May 30. May 30 was the last day for concluding the transaction for Wolkowitz had planned to leave the next day for a Florida vacation. Scissors was also carrying an insurance binder, dated May 28, which he handed to Wolkowitz. The binder purported to bind Home Insurance coverage for the term June 1, 1975 to June 1, 1976. The binder was on a printed ICI form, with the Home Insurance name typed into the space for "Insurer(s)". The premium was $260,000, payable $65,000 per quarter. The binder was cancelable by Home or by ICI upon 90 days' notice to Inland.

Wolkowitz was confused by the binder on two counts. First, he had given a Home Insurance agent of record letter to Associated Underwriters and not to ICI; and, second, he had been told by Scissors that the insurance would be written with Lloyd's.

Scissors told Wolkowitz that Associated Underwriters was dealing with Home's domestic office, while he was dealing with Home's foreign office. He went ahead to say that it was actually Lloyd's of London which was furnishing the insurance and that Home was only "fronting" for Lloyd's. Wolkowitz believed Scissors, and at Scissors' request the agent of record letter was typed on Inland letterhead stationery and was signed by Wolkowitz. He left for Florida, believing he had insurance.

Wolkowitz learned the next week, first from Associated Underwriters, and then directly from Home, that Home was denying coverage under the binder, and that Inland (as Home claimed) was unprotected by insurance.

After Home disclaimed coverage, ICI issued a second binder, purportedly binding coverage for Old Republic Insurance Company, effective June 5, 1975. The coverage as shown in the binder and in a June 9 letter from Scissors to Wolkowitz was coextensive with the coverage in the preceding aborted Home binder. The annual premium, however, was $400,000 payable $100,000 per quarter, as against $260,000 payable at $65,000 per quarter for the Home binder. Wolkowitz at first demanded some writing from Old Republic confirming the coverage, and afterwards made repeated demands for an insurance policy from Old Republic. An Old Republic insurance policy was never delivered to him. He did get a Telex message from one D.H. Maple, vice-president, American National General Insurance Agencies, stating: "... (W)e confirm we have bound coverage hull and pandi effective June 1975 in Old Republic Insurance Company". The Telex message was dated June 6, 1975. On July 16 ICI exercised its privilege to cancel the Old Republic coverage as September 17. It refused to explain its reason for doing so.

ICI on June 12 invoiced Inland for $100,000 for a quarter's premium. Wolkowitz declined to pay it, but said he would pay the $65,000 to which he had earlier agreed. ICI sent an invoice for $65,000, which Inland did proceed to pay.

For the September 17, 1975-June 1, 1976 period Inland secured insurance from Lloyd's of London. The premium for that period was $190,000. Added to the $65,000 Inland had paid ICI for the Old Republic coverage, its total premium cost for the June 1-June 1 year was somewhat less than the $260,000 it had initially agreed to pay. However, most significantly, the aggregate deductible to be paid by the insured was $150,000 under the Lloyd's policy, whereas it had been $100,000 under the Home binder and under the Old Republic coverage.

Inland had no losses during the June 1-September 17 period, but during the September 17-June 1 period it had losses exceeding the $150,000 deductible.

*Proof of damages as element of cause of action for fraud.*

■ ICI advances a single point on appeal, that Inland suffered no damages as a result of its failure to receive the Home Insurance coverage which Scissors had represented that ICI had secured for it, and that Inland had therefore made no submissible case of fraud. Proof of substantial damages, ICI correctly argues, is an element of a cause of action for fraud, *Mills v. Keasler*, 395 S.W.2d 111, 118 (Mo.1965); *Lammers v. Greulich*, 262 S.W.2d 861, 864 (Mo.1953). Since the 90 days' insurance coverage cost Inland no more than it had originally contracted to pay, ICI says, it suffered no damage.

Inland, on the other hand, argues that the evidence showed substantial damages, which it computes as follows: Inland takes its actual premium cost for the year June 1, 1975-June 1, 1976 and adds thereto the $150,000 aggregate deductible which it had to pay under the Lloyd's policy for losses occurring after September 17. (There were no losses sustained during the June 1-September 17 period.) From that total it deducts the sume of (1) $260,000 agreed premium under the Home binder and (2) the $100,000 aggregate deductible which it would have had to pay under said binder, had it been in effect when the losses were incurred. The difference, it maintains, represents its damage. That difference we compute to be $45,000, although Inland comes up with a larger figure.

We note that ICI did not at the trial, and does not here challenge the *measure of damages* as computed by Inland, but whether there were any substantial damages at all. ICI rests its appeal solely upon the proposition that nothing after September 17, 1975, is to be taken into account; that Inland was entitled under the Home Insurance binder to only 90 days' insurance, since under the binder Home or ICI, could cancel the insurance on 90 days' notice. Having gotten 90 days' and more insurance coverage (June 1-September 17) for the agreed amount, $65,000, says ICI, that was the end of it.

■ ICI's argument must be rejected, and Inland must be sustained on this point. Home's (and ICI's) right of cancellation does not mean that the insurance, if it had been as represented by the binder and as represented by Scissors orally, was only for a 90-day term. Home or ICI might have canceled the insurance on 90 days' notice, it is true. Presumably they could do so without cause, without incurring any liability. That, however, would require affirmative action on the part of the insurer or the broker. Presumably it would not be done randomly or whimsically but, as a matter of practical business only for good reason. It was even more unlikely that the cancellation would be done at once, and with each passing day without notice of cancellation the coverage was nailed down for 90 days longer. Inland could feel secure for a year, even though Home might terminate its obligation by cancellation. It was unlike a contract which would expire by its terms at the end of 90 days. The difference between a one-year contract, cancellable upon 90 days' notice, and a contract for a 90-day term, is a substantial difference. As to the *measurement of the value* of the difference, that, as before noted, is not an issue with which we are concerned here.

We have not overlooked a feature emphasized by ICI, to wit, that the 90-day cancellation was demanded by Wolkowitz in lieu

of the usual 30-day cancellation clause, but we conclude that is not significant.

We hold that the evidence made a submissible case for damages for fraud against ICI.

*Authority of ICI to bind Home Insurance.*

Inland appeals from a judgment in favor of Home upon Inland's claim for damages for breach of contract in failing to provide the insurance coverage specified in the May 28 binder which it had received from ICI. The judgment was based upon a directed verdict entered by the court upon Home's motion at the conclusion of Inland's evidence. Inland argues on appeal that the court committed reversible error in holding that it had not made a submissible case and in directing a verdict in Home's favor.

Home, on the other hand, claims that ICI had neither actual nor apparent authority to bind Home to the coverage shown in its binder, and that it, Home, never contracted to furnish the insurance therein described. Thus the issues are drawn between the parties.

We hold that the trial court was correct in directing a verdict for Home at the conclusion of Inland's evidence. The evidence failed to show actual or apparent authority in ICI to bind Home to the contract for coverage.[2]

■ We first take up the question of ICI's *actual* authority to bind Home. We find that such actual authority was lacking. The authority of ICI to bind Home by the issuance of a binder to Inland would have come with the "release of the quote", by which Home would authorize ICI to make a proposal to the proposed insured to provide certain coverage for a certain time for a certain premium. ICI had no such authority. That this was understood both by Home and by ICI is evidenced by the efforts of ICI's Habel and King, in their telephone conversations with Home's Hull and Bergin on May 30, to secure from Home a "release" (to ICI) of its quote. It

should be borne in mind that Home had already prepared a quotation upon the Inland coverage. It had been prepared for Associated Underwriters, Inc., based upon an agent of record letter which Inland had given to Associated Underwriters. That quotation was for an annual premium of $365,702, and this proposal had been made to Inland by Associated Underwriters. Whether the amount of the quoted premium was known to ICI is not clear from the record.

Inland emphasizes the May 30 telephone conversation between Habel (for ICI) and Bergin (for Home) from which Habel might have understood that Home would release its quote to ICI if ICI obtained an agent of record letter from Inland. Inland seems to argue that the signing by Wolkowitz of the agent of record letter established ICI's authority. But obtaining the agent of record letter was not the end of the matter. If ICI did obtain an agent of record letter from Inland (as it did, by the guile of ICI's Scissors), Associated Underwriters would still have the opportunity to return to Inland and attempt to secure a rescission of the ICI agent of record letter. If Inland did not rescind the second agent of record letter, Home would *then*, in pursuance of the Habel-Bergin conversation, supply the quote to ICI to propose to Inland. The final step was *never taken.* There is no way that ICI can be deemed to have had actual authority on the basis of the agent of record letter to proceed to propose insurance coverage to Inland.

Inland points to an "agency agreement" subsisting between Home and ICI. This "agency agreement" gave ICI no actual authority to issue its binder. The authority of ICI to bind Home was by terms of the agreement "subject to such binding authority as may be established by the company." It was fully understood both by Home and by ICI that ICI had no authority to quote marine insurance coverage to Inland with-

---

**2.** The disposition we make of this point makes it unnecessary for us to deal with questions of double damages and of election of remedies, presented by Inland's contradictory positions with respect to coverage by Home under the ICI binder.

out having secured from Home a specific proposal as to coverage and as to premium.

■ Inland, however, relies, more than on ICI's actual authority, on the *apparent* authority of ICI to bind Home. Apparent authority binds an ostensible principal by the acts of an ostensible agent on an estoppel theory. The theory is that the principal has in some manner invested the agent with the appearance of authority, and when an innocent third person relies upon the agent's authority *as it appears to him,* the principal is estopped to deny the agent's authority. The principle is stated in the following terms in *Baker v. St. Paul Fire & Marine Insurance Company,* 427 S.W.2d 281, 285–86 (Mo.App.1968):

> It is the law that "In the absence of fraud on the part of insured and the agent, an insurance company is bound by all acts, contracts, or representations of its agent, whether general or special, which are within the scope of his real or apparent authority, notwithstanding they are in violation of private instructions or limitations on his authority, of which the person dealing with him, acting in good fath (sic), has neither actual nor constructive knowledge." 44 C.J.S. Insurance Sec. 149, pp. 817–818. *Mitchell v. Metropolitan Life Ins. Co.,* Mo.App. 116 S.W.2d 186. And, even if the agent's actual authority is less than his apparent authority, where the limitations thereon are unknown to the other contracting party, "apparent authority is equal to real authority." 44 C.J.S. Insurance Sec. 228, p. 946; *Shelby v. Connecticut Fire Ins. Co. of Hartford,* 218 Mo.App. 84, 262 S.W. 686
> . . .

■ Had Home by any means clothed ICI with *apparent authority* to bind Home to the insurance coverage represented by the binder? None at all. Wolkowitz's belief that ICI had Home's authority to issue the binder was not based upon anything Home or any of its agents said, did or permitted. The belief was based upon what *Scissors* told him. Apparent authority cannot be based upon the ostensible agents' unauthorized claims of authority. 3 Am.

Jur.2d Agency, Sec. 74 (1964) *Jeff-Cole Quarries, Inc., v. Bell,* 454 S.W.2d 5, 13 (Mo.1970); *Cameron Mutual Insurance Company of Missouri v. Bouse,* 635 S.W.2d 488, 491–92 (Mo.App.1982).

The agency agreement gave no apparent binding authority to ICI because its existence was unknown to Inland at the time.

We note further that Wolkowitz, president of Inland, who alone represented Inland in this transaction, was a sophisticated insurance purchaser who understood the role of ICI as securing premium quotations and agreements to insure from the underwriters. He understood that the reason for the agent of record letter was to enable an agent or broker to secure quotes in Inland's behalf from the underwriter. He had wisely adopted a policy of giving no more than one agent of record letter to any one underwriter. He was dealing with more than one agent or broker in attempting to secure the insurance coverage and knew that they were contacting various underwriters for quotes in Inland's behalf.

Inland's case is wholly unlike that of *Baker v. St. Paul Fire & Marine Insurance Company,* supra, where the insurance company itself had furnished the alleged agent with certain forms which would give to an innocent purchaser the belief that the agent had authority to bind coverage by oral agreement as of a date earlier than the date shown on the policy itself when received.

The other cases cited by Inland, namely, *Boyle v. Colonial Life Insurance Company of America,* 525 S.W.2d 811, 818 (Mo.App. 1975); *The Travelers Indemnity Company v. Beaty,* 523 S.W.2d 534, 538–539 (Mo.App. 1975), also find the agent's apparent authority in materials furnished to the agent and exhibited to the customer, which could lead an unsophisticated customer to believe that the agent had actual authority to bind the insurer which he represented to some undertaking not expressed in the policy.

None of the information upon which Wolkowitz based his belief that ICI had authority to bind Home can in any way be traced to Home. The May 28 binder itself was

upon an ICI printed form, with the name of "Home Insurance Company" typed into the space for "Insurer(s)".

ICI had neither actual nor apparent authority to bind Home to the insurance coverage which the binder purported to furnish, and the trial court ruled correctly in sustaining Home's motion for a directed verdict.

*Authentication of documents for admissibility.*

Inland claims that it actually never had Old Republic insurance coverage, and that ICI's representation that it had bound coverage with Old Republic was fraudulent, as had been its representation that it had bound coverage with Home Insurance. The jury found against Inland on that claim, and Inland appeals, claiming error in the admission of two Old Republic insurance policies purporting to cover the Inland marine risk from June 5 to September 17.

The Old Republic policies which were admitted into evidence were received by Habel at ICI, according to Habel's testimony, along with a cover letter from American National General which was dated September 12, 1975. It is to be noted that this was only five days before the effective cancellation date of September 17. Habel said he handed the insurance policies to Ralph Friedman of ICI, and supposed they were delivered to Inland.

The policies were offered for proof of the fact of their issuance by Old Republic. Their precise terms were not at issue, except to the extent that they showed that the policies were issued in pursuance of the binder and of Scissors' June 9 letter to Inland which described the policy terms.

■ We hold that the authentication was sufficient for admissibility. Direct and positive evidence of genuineness of a document is not required for its admission. The authenticity may be shown by circumstantial evidence. *State v. Clark,* 592 S.W.2d 709, 717 (Mo. banc 1979); Fed.R.Evid. 901; 7 Wigmore Evidence Sec. 2131 (Chadbourn rev. 1978). The sufficiency of the circumstantial evidence will vary from case to case. We take into account: 1. The claim was not upon the policies themselves, but was upon the representation, alleged to be false, that ICI had secured the insurance from Old Republic. The policies were merely additional evidence that Old Republic was obligated on the Inland marine risk. They were cumulative to the evidence of the binder issued by ICI which purported to bind Old Republic to the risk. 2. The policies were in substantial agreement with the binder, with the Telex message from D.H. Maple, vice-president of American National General, to Wolkowitz, and in agreement with the transmittal letter from Maple to ICI—all of which documents were admitted into evidence without objection. 3. There was nothing inherently suspicious about the policies. The fact that the policies were prepared *after* the cancellation notice of July 16 (as evidenced by the termination date of September 17 shown on the policies) is not necessarily important. Wolkowitz himself said, with respect to the time required to get a policy after the binder had been written: "It depends, if it is a foreign policy such as Lloyd's, we usually get them from 90 to 100 days or any domestic company, we never had any problem getting them within a month's time."

■ Of course, in ruling upon the sufficiency of the evidence of authentication, the court does not decide the ultimate issue of its genuiness. That remained for the jury to decide, and the opponent of the documents could still challenge their authenticity by evidence and by argument. See 7, Wigmore, Evidence, Sec. 2130, 2131 (Chadbourn rev. 1978), Federal Rules of Evidence, Rule 901.

*Conclusion.*

Finding no reversible error, we affirm the judgment.

GAERTNER, P.J., and GEORGE A. ADOLF, Special Judge, concur.