**OTTAWA CHARTER BUS SERVICE, INC., Appellant–Respondent,**

v.

**Edward C. MOLLET, Jr., Midwestern General Agency, Incorporated, Respondents,**

**National Fire & Marine Ins. Co., Respondent–Appellant.**

**No. WD 42350.**

Missouri Court of Appeals, Western District.

May 29, 1990.

Donald P. Woodell, Independence, for Ottawa Charter Bus Service, Inc., appellant-respondent.

Thomas B. Alleman and Millie M. Donohoe, Niewald, Waldeck, Norris & Brown, Kansas City, for Nat. Fire & Marine Ins. Co., respondent-appellant.

Robert Ernest Gould, Kansas City, for Midwestern Gen. Agency, Inc., respondent.

William Lester Voorhies, Kansas City, for Edward C. Mollet, Jr., respondent.

Before TURNAGE, P.J., and SHANGLER and LOWENSTEIN, JJ.

TURNAGE, Presiding Judge.

Ottawa Charter Bus Service Inc. brought suit against Edward C. Mollet, Jr., Midwestern General Agency, Incorporated and National Fire & Marine Ins. Co. in seven counts. Only two counts were submitted to the jury and those were submitted only against National. The claims against Mollet and Midwestern were dismissed. The two counts submitted are the only issues raised on this appeal. One submission was for breach of contract for the failure of National to issue a liability insurance policy with limits of $5,000,000 and the other was against National for conversion. The jury returned a verdict in favor of Ottawa on the breach of contract claim in the amount of $100,000, but the court held the evidence would only support a verdict in the amount of $5,467.38 and entered judgment for that amount. On the conversion claim the jury returned a verdict in favor of Ottawa in the amount of $13,000.

Ottawa has appealed from the judgment entered on the breach of contract claim. National has appealed from the judgment entered against it on both counts. On the contract claim, National contends the instruction which submitted the issue of the agency of Mollet was not supported by the evidence. On the conversion claim, National contends the evidence failed to support a submission of conversion.[1] Reversed and remanded.

Ottawa was engaged in the operation of tour buses and required liability insurance to cover its operation. Up to September 1985 Ottawa had been insured by Transit Casualty, but Ottawa was informed that Transit would no longer be able to supply coverage and Ottawa was required to look elsewhere. Ottawa contacted Mollet who was an independent insurance agent. As an independent agent Mollet was not employed by or designated as an agent by any insurance company but procured customers and placed the coverage with various companies. Robert Smith, the president and sole shareholder of Ottawa, contacted Mollet and told him that he wanted to get $5,000,000 in liability coverage for his fleet of buses.

Mollet contacted Midwestern which was a general agency representing several companies. In this case Midwestern and National admitted that Midwestern was the agent of National. Mollet was required to go through Midwestern to deal with National because he was not an agent of National. In late July or early August of 1985 Mollet submitted a universal application form to Midwestern and other agencies seeking coverage for Ottawa. Mollet testified that he submitted an application to Midwestern for $5,000,000 liability coverage for Ottawa. Betty O'Conner, an underwriter for Midwestern, testified that she received the application but the $5,000,000 figure had a line drawn through it and $1,000,000 was written above. O'Conner submitted the application to National requesting $1,000,000 in coverage and on September 26, 1985, National agreed to is-

---

1. The two contentions of National are dispositive of the appeal by National. These two con-
tentions also dispose of the issues raised in Ottawa's appeal.

sue a policy covering Ottawa for $1,000,-000. O'Conner testified that she told Mollet that the $1,000,000 policy would be issued for a premium of $86,335. Mollet testified the quote was for a policy with liability limits of $5,000,000. The policy was thereafter issued with liability limits of $1,000,000 for the period of September 26, 1985 to September 26, 1986.

On September 28, Mollet issued a binder for $5,000,000 of liability insurance to Ottawa on Mollet's form in which the name of National was typewritten in a blank as the company issuing the insurance. The form otherwise did not contain the name of National or Midwestern. The form was signed only by Mollet. The only evidence that Midwestern authorized Mollet to issue the binder was the testimony of Mollet.

Ottawa paid the premium of $86,335 and thought it had obtained a policy with $5,000,000 coverage. Ottawa operated on the binder prepared by Mollet and used the binder to satisfy the insurance requirements of several states and the Interstate Commerce Commission. In late November or early December Mollet received the policy from National with coverage in the amount of $1,000,000. Mollet advised Ottawa that the policy had been received but that a mistake had been made and the limits of liability were $1,000,000 instead of $5,000,000. Mollet stated that he would try to correct the mistake. At one time Mollet requested Midwestern to request National to issue a policy for $5,000,000 but National declined.

In the meantime Ottawa was operating on the binder issued by Mollet but the ICC kept insisting that it needed to see a policy with liability coverage of $5,000,000. When Mollet could not produce a policy with limits of $5,000,000 Ottawa purchased another policy with an additional $4,000,000 coverage to be effective from June to September 1986 for a premium of $5,467.38.

Fortunately Ottawa suffered no losses between September 1985 and September 1986 except for a bus that caught fire in a garage and the policy issued by National paid that loss. Ottawa was able to operate from September to June on the binder issued by Mollet and thereafter on its two policies. It lost no income from the failure of the National policy to provide $5,000,000 in coverage.

Mollet and Midwestern entered into a limited producer's agreement which was backdated to September 27, 1985. The agreement was necessary for Mollet to procure coverage through Midwestern for various clients and to be paid a commission by Midwestern. The agreement provided that Mollet had no authority, express or implied, to bind or obligate Midwestern, either as to a risk being submitted for consideration or as respects changes in the terms and conditions of any policy or binder issued by Midwestern. The agreement further provided that Mollet acknowledged that no insurance submitted for consideration by Midwestern would be effective until acceptance was indicated in writing or a policy or binder was issued by Midwestern. There was no evidence that Midwestern ever issued any binder with respect to the $5,000,-000 coverage for Ottawa or that Midwestern ever authorized Mollet to execute any binder for any amount of insurance.

Midwestern paid National the entire premium of $86,335. Ottawa paid $26,000 to Mollet as part of the premium and financed the balance with a finance company which paid Midwestern. Of the $26,000 Ottawa paid Mollet, Mollet only paid $12,000 to Midwestern. After deducting Mollet's commission Mollet owed Midwestern about $7,500.

In November or December 1985 a bus burned and that bus was deleted from the policy. Midwestern credited the finance company with about $4,500 as a return of premium for the deletion. This credit inured to the benefit of Ottawa. In January 1986, Ottawa requested two more buses to be deleted from coverage. The refund premium on those buses totaled about $14,500. National credited Midwestern's account with that amount and Midwestern in turn credited Mollet's account in the same amount. Mollet, because of his failure to remit all of the premium due on the Ottawa policy and because of other dealings with Midwestern, had a negative balance in his

account with Midwestern. After the $14,-500 was credited by Midwestern to Mollet's account, Mollet's account was still in a negative balance with the result that Ottawa did not receive any part of the return premium.

Ottawa submitted its breach of contract claim to the jury under a verdict directing instruction which required the jury to find that Mollet was an agent of Midwestern, that Midwestern was an agent of National, and that Ottawa and Mollet entered into an agreement whereby Ottawa agreed to pay $86,335 and National agreed to issue an insurance policy with liability limits of $5,000,000. The instruction required a finding that the agreement was made with Mollet and Midwestern acting within the scope and course of their agency with National. The instruction required a finding that Ottawa performed its agreement and National failed to perform its agreement and Ottawa was thereby damaged. Although Ottawa has appealed from the judgment awarding it less than the jury verdict, the decisive issue is raised by National in its appeal from the judgment entered on this claim. National contends that there was no evidence to support Instruction No. 7 which submitted that Mollet was an agent for Midwestern and National.

The question of agency was submitted by Instruction No. 8 in the form of MAI 13.07(2) (1986 new), which is the form for submitting the issue of apparent authority. Instruction No. 8 allowed the jury to find that the conduct of Mollet was such that an ordinarily careful and prudent person would believe that Mollet had authority to perform acts on behalf of Midwestern and Midwestern knew, or had reason to know, of the conduct of Mollet and allowed such conduct. National contends that there was no evidence to support a finding by the jury that Mollet was the agent of Midwestern.

Midwestern and National admitted that Midwestern was the agent of National. In order to fasten liability on National for the acts of Mollet it was necessary for Ottawa to prove that Mollet was the agent of Midwestern because there was no evidence of

any contact between National and Mollet. Ottawa did not produce any evidence of actual authority so it chose to proceed on a theory of apparent authority and so submitted its case to the jury. In *Inland USA, Inc. v. Reed Stenhouse, Inc.*, 660 S.W.2d 727, 733[4] (Mo.App.1983), the court confronted facts identical to the facts in this case. There an independent agent issued a binder to Inland on his own form with the name of a company typed in, just as Mollet did in this case. As in this case, there was no authority shown for the issuance of the binder so the case was submitted on the theory of apparent authority. The court stated that apparent authority is founded on the theory that the principal has in some manner invested the agent with the appearance of authority so that when an innocent third person relies upon the authority of the agent as it appears to him, the principal is estopped to deny the authority of the agent. The court held at 733[5, 6] "apparent authority cannot be based upon the ostensible agents' unauthorized claims of authority." In that case the only evidence of authority in the agent was the agent's statements. There was no evidence of any action on the part of the alleged principal which would lead the plaintiff to believe the agency existed. The court held that apparent authority could not be based upon the statements made by the person alleged to be the agent of another but had to be based upon the acts of the alleged principal.

In *Shelby v. Slepekis*, 687 S.W.2d 231, 235[6–8] (Mo.App.1985), the court held that an apparent agency may be created when the conduct of the principal is such that an appearance of agency would lead the public to believe that the agent possesses authority to act in the name of the principal. The court stated "to find apparent agency, the appearance of authority must have been created by the principal." *Id.*

■ There can be no dispute that under the law apparent agency cannot be created by the acts of the supposed agent alone. The one sought to be held as principal must have created the appearance in order to be

held liable under the theory of apparent agency.

 Here there was nothing that Midwestern or National did which would cause Ottawa to think that Mollet was the agent of either. Ottawa's dealings were with Mollet entirely, the binder was issued by Mollet with no appearance of authority from National or Midwestern and Ottawa had no contact with Midwestern until some months after the policy for $1,000,000 was issued. It is clear from the evidence that at no time did Midwestern or National do anything which created an appearance of apparent authority for Mollet to act in their behalf. Ottawa relied only on the statements and acts of Mollet which are insufficient to support a finding of apparent authority in him.

Because there was no evidence to support a finding of apparent agency on the part of Mollet to act for Midwestern, there was no evidence to support a finding that Mollet was the agent for National. Absent evidence of Mollet's agency for National, there was no evidence to support a finding by the jury that Ottawa had an agreement with National for the issuance of a $5,000,-000 policy. In that situation the judgment in favor of Ottawa on the breach of contract claim must be reversed. Ottawa pleaded that Mollet had actual authority to act for National and on remand will have opportunity to show facts to support that allegation.

 The conversion claim was submitted on the theory that Ottawa had given National funds for the specific purpose of paying an insurance premium and such funds were not entirely applied by National to payment of the premium. Again the decisive issue is raised by the appeal of National that Ottawa's verdict director on conversion was not supported by the evidence. The evidence was that Ottawa paid a premium for the issuance of a policy and the policy was in fact issued. Thus, the money Ottawa paid was applied to the premium for the policy which was issued. Ot-

tawa complains that the refund which was due when two buses were deleted from the policy was not returned to it.[2] Ottawa contends its premium was a specific fund which was paid to National and that National diverted such funds for another purpose when it credited the return premium to the account of Midwestern and failed to pay the return premium to Ottawa.

That contention is contrary to the evidence. There was no evidence that Ottawa gave National a specific fund to be held for a special purpose. Ottawa owed a premium for an insurance policy and paid it. This is a far cry from giving National a specific fund to be held for a specific purpose. When the buses were deleted from the policy Ottawa claimed to be entitled to a return premium. The return premium constituted only a debt and was not the misapplication of a specific fund on the part of National. In *Emerick v. Mutual Ben. Life Ins. Co.,* 756 S.W.2d 513, 523[5] (Mo. banc 1988), the court stated:

> Conversion does not generally lie for money represented by a debt. *Dillard v. Payne,* 615 S.W.2d 53, 55 (Mo.1981). Conversion may lie, however, as to funds placed in the custody of another for a specific purpose and their diversion for such other than such specified purpose. *Dillard at 55.*

The evidence shows only a debt for the return premium and not the diversion of funds to an unauthorized purpose. No evidence supported a submission of conversion and the judgment on that count cannot stand. However, Ottawa presented evidence that may support recovery of the return premium on another theory.

The judgment on each count is reversed and this cause is remanded for further proceedings.

All concur.

---

**2.** Although three buses were deleted from coverage, Ottawa made no claim for the return premium for the burned bus because it received

credit for that amount through its finance company.